KERR–McGEE CORPORATION, et al., Plaintiffs,

v.

James G. WATT, Secretary of the Interior, Defendant.

Civ. A. No. 80–3179.

United States District Court, District of Columbia.

July 13, 1981.

Patrick M. Norton, Peter J. Nickles, Covington & Burling, Washington, D. C., for plaintiffs.

Bruce C. Rashkow, Wells D. Burgess, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

**FLANNERY, District Judge.**

This suit challenges the Secretary of Interior's rejection of two bids for offshore oil and gas leases offered at Outer Continental Shelf (OCS) lease sale A62 in September, 1980. Plaintiff has moved for summary judgment alleging that the rejections were inconsistent with the Secretary's treatment of other bids offered at the same and subsequent lease sales. The Secretary has moved for summary judgment on the grounds that his actions were within the discretion granted to him by the Outer Continental Shelf Lands Act and were consistent with prior decisions.

*Facts*

The Outer Continental Shelf Lands Act, 43 U.S.C. § 1337(a)(1), authorizes the Secretary of the Interior "to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, any oil and gas leases on submerged lands of the outer Continental Shelf . . . ." These leasing activities are to be conducted in a manner designed "to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government." 43 U.S.C. § 1344(a)(4). The implementing regulations for the Act provide that "[t]he United States reserves the right to reject any and all bids received for any tract, regardless of the amount offered." 43 C.F.R. § 3316.5(b). This reservation was clearly stated in the notice of OCS sale A62. 45 Fed.Reg. 55931, 55945 (Aug. 21, 1980), Ad.Rec.Doc. 1.

Following bidding for OCS leases, the Secretary must analyze each high bid to determine whether it should be accepted or rejected. Although Interior Department regulations do not specify criteria by which this determination is to be made, the Secretary relies upon a "Post Sale Matrix" or "Post Sale Analysis Chart" prepared by the Bureau of Land Management (BLM) for each lease sale. *See* Ad.Rec.Doc. 4. The BLM matrix provides a variety of data on each tract and each high bid in order to help determine whether high bids satisfy the statutory objective of return of fair market value.

The first factor considered is the Mean of the Range of Values, or MROV. This is the Geological Survey's estimate of the value of the tract based on its analysis of geological data and a computer model simulation of production history and projections of discounted cash flow. Bids above MROV are almost always accepted.

The Geological Survey also calculates the effect on the value of the tract to the Government if the high bid were rejected and the tract were held to be reoffered at a future lease sale. This calculation is called the Discounted MROV or DMROV. Normally the DRMOV will be less than the MROV since any delay in reoffering results in a loss of the use of receipts. However, in certain cases, including this one, the DMROV will exceed the MROV because of rising energy prices. The DMROV is not considered in evaluating the high bid in those circumstances. Ad.Rec.Doc. 2. However, a high bid above DMROV is almost always accepted.

If a high bid is below both MROV and DMROV, the Secretary compares the bid with the Average Evaluation of Tract (AEOT) factor, which takes into account the actual bids received on the tract. It represents the average of all bids submitted plus the MROV. Thus if four bids were submitted, the AEOT would be calculated by adding the four bids and the MROV and dividing by five.

High bids above the MROV, the DMROV, and the AEOT are generally accepted, while high bids which fall below all three values are generally rejected. However, there are no fixed standards for determining when a high bid is inadequate. This case concerns two high bids which exceed the AEOT but fall below both the MROV and the DMROV. In such cases the Secretary examines the relationship between the MROV and the high bid; the reliability of the Geological Survey data supporting the MROV; the number of bidders on tract; and the relationship between the AEOT and the bid. *See* Ad.Rec.Doc. 2, Doc. 4 at 2.

The number of bidders is important because the more bidders, the more reliable the AEOT is as an indicator of the market value of the tract.[1] Thus if there are many bidders, the Secretary is more likely to accept a bid which exceeds the AEOT but falls below the MROV. Conversely, the more reliable the Geological Survey (GS) data supporting the MROV, the less likely it is that the Secretary will accept a bid below the MROV.[2]

The decision to accept or reject high bids in OCS sale A62 followed this general pattern. Bids were received on 147 of the 192 tracts offered for lease. The high bids on 108 tracts exceeded all three evaluation figures and all of these bids were accepted. The high bids on 28 tracts fell below all three figures, and all those bids were rejected. On the remaining 11 tracts, the high bids exceeded AEOT but fell below both MROV and DMROV. Plaintiffs' bids of $5,108,000 on tract A62–20 and $16,488,000 on tract A62–228 both fell into this third group. While there was a consensus among BLM, GS and the Solicitor's office to accept all high bids in the first group, and reject all high bids in the second group, opinion differed as to the remaining 11 bids. There was a consensus to accept the high bids on tracts 57, 141 and 183. BLM and GS recommended acceptance of the bid on tracts 87, 144 and 156, but the Solicitor questioned consistency. As to tracts 146 and 167, BLM recommended acceptance based on adequacy of competition, GS recommended rejection based on the reliability of its data, and the Solicitor questioned consistency. With respect to tracts 20 and 228, the tracts at issue in this case, and tract 180, there was a consensus to reject. On October 9, 1980 the acting Secretary of the Interior decided to accept 8 bids from the third group and to reject the high bids on tracts 20, 180 and 228. Plaintiffs, the disappointed bidders on tracts 20 and 228, filed this action on December 12, 1980.

*Discussion*

 The Secretary of the Interior has broad discretion in leasing public lands and resources to insure that the government exacts a fair return from the person exploiting its resources. *Hannifin v. Morton,* 444 F.2d 200, 202 (10th Cir. 1971); *Safarik v. Udall,* 304 F.2d 944, 950 (D.C.Cir.1962). While the Secretary has no explicit statutory authority to reject a high bid from a responsible bidder in an OCS oil and gas lease sale, in prior cases his power of rejection has been assumed. *Chevron Oil Co. v. Andrus,* 588 F.2d 1383, 1383 n.2 (5th Cir.), *cert. denied,* 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 108 (1979); *Kerr-McGee Corp. v. Morton,* 527 F.2d 838, 839 (D.C.Cir.1975). Plaintiffs contend that the decision to reject its bids was inconsistent with prior, contemporaneous, and later decisions to accept similar bids, and argue that such inconsistency makes the decision to reject "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard of review upon such a challenge to agency action is generally a deferential and narrow one which presumes the agency action to be valid, forbids the court from substituting its judgment for that of the agency, and requires affirmance if a rational basis exists for the agency decision. *Ethyl Corp. v. EPA,* 541 F.2d 1, 33–37 (D.C.Cir.1975), *cert. denied* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

According to the Secretary, plaintiffs' bids were rejected for three reasons. First, there were only two bids on each of the tracts in question, and this militates against relying on the fact that both bids were above AEOT. When a bid cannot be accepted because it exceeds MROV or DMROV, the Secretary compares the bid with AEOT, which consists primarily of information provided by other bidders. The theory behind AEOT is that each bid repre-

---

1. However, the AEOT is of less value in evaluating a bid where an anomalously low bid is received, particularly where there are few bidders. Ad.Rec.Doc. 2. The high bid may then exceed the AEOT only because the anomalously low bids have caused the AEOT to be low.

2. The Secretary may consider other factors not at issue in this case. *See* Ad.Rec.Doc. 4 at 4–B.

sents the bidder's best estimate of the value of a tract, and the AEOT yields an average estimate of value. Like any average, the more data which goes into its calculation, the more reliable the average. Thus the Secretary places greater trust in the information provided by the market and reflected in the AEOT, rather than the information provided by his own estimate, MROV, where the number of bids is large. For example, if there are ten bids, all below the MROV, causing AEOT to be lower than MROV, the Secretary can feel confident that the MROV is too high and that he should accept a high bid above AEOT. However, in this case there were only two bids, AEOT is a less reliable indicator, and the Secretary gave little weight to the fact that both bids were above AEOT in determining whether the high bid represented fair value.

The second reason the Secretary rejected the bids in question is that a comparison with past lease sales showed that high bids on two-bid tracts with similar percentages of MROV and AEOT had almost always been rejected in the past. To insure consistency on those tracts where the high bid falls below MROV but above AEOT, the Solicitor prepares a consistency review chart. *See* Ad.Rec.Doc. 12. Careful inspection of that chart reveals that the Secretary's decision to reject the two bids at

issue was entirely consistent with prior decisions. The third reason for rejection was that the Secretary possessed quite accurate geological data on the two tracts, which militates against accepting bids below the MROV.

Plaintiff argues that the Secretary's rejection of its bids is inconsistent with prior decisions. Plaintiff first points to "Sale A62 Consistency Record," Ad.Rec.Doc. 11, Table II, which shows five cases in five different lease sales where the Secretary accepted high bids falling below all three standards—MROV, DMROV and AEOT. However, the high bid was accepted on each of those tracts because it was determined that drainage was occurring (i. e. a well located on another tract was draining resources from the tract for bid), and it was believed that the value of each tract would be significantly diminished before it could be reoffered for leasing. Affidavit of Thomas Readinger, ¶ 11. In contrast, GS stated that drainage was not significant for the tracts at issue, A62–20 and A62–228. Ad.Rec.Doc. 9 at 2.

Plaintiff also contends that it was impermissible for the Secretary to accept high bids for tracts A62–144 and A62–167 while rejecting their bids. The relevant data is summarized below in table form.

| Tract | % MROV | % DMROV | % AEOT | Bids | Data[3] Reliability | Acc/Rej |
|-------|--------|---------|--------|------|---------------------|---------|
| A62–144 | 67 | 73 | 135 | 3 | B | Accept |
| A62–167 | 41 | 45 | 110 | 3 | A | Accept |
| A62–20 | 79 | 64 | 109 | 2 | B | Reject |
| A62–228 | 79 | 74 | 102 | 2 | A | Reject |

Plaintiffs' high bids compare unfavorably with the high bids on tracts 144 and 167 in only two respects. First, there were three bids on each of the accepted tracts, while there were only two bids on the rejected tracts. Second, plaintiffs' high bids constitute a slightly lower percentage of AEOT than do the accepted bids.

Plaintiffs strongly urge that the number of bids submitted on a tract is not a legally permissible criterion for determining whether to accept a high bid. They rely on two decisions by the Board of Land Appeals. *In re Tipperary Land Exploration Corp.*, 77 I.D. 596 (1972), struck down a requirement that there be at least six bids

**3.** "A" indicates the most reliable category of geological data, while "E" represents the least

reliable category on a scale from A to E.

per tract in OCS auctions to be considered sufficiently competitive to permit the awarding of a lease to the high bidder. *Tipperary* was followed in *In re Exxon Co., U.S.A.,* 15 I.B.L.A. 345 (1974). There the criteria for evaluating bids included the number of bids as evidence of the competitiveness of the bidding. The Board concluded that "Absent a charge of fraud or collusion the number of those who bid on a single tract cannot serve as a ground for rejection of a bid, nor as a criterion for placement in one category vis-a-vis another." *Id.* at 357. Thus according to plaintiffs, the number of bids cannot be used as a basis for deciding that AEOT is a more accurate indicator of value where there are more bids.

However, the decisions of the Board of Land Appeals are not binding on the Secretary. The Board acts on behalf of the Secretary and the Secretary can supplant the Board at any time. 43 C.F.R. § 4.5(a)(1) and (2) (1980). In addition, in 1974 the Secretary changed the bid evaluation system from the system described in Exxon to the MROV, DMROV, AEOT system now in use. The Secretary now makes final decisions on bids directly, and the Board and Land Appeals is no longer involved. 43 C.F.R. § 4.410 (1980). The number of bids has been considered by the Secretary as a factor in his decisions consistently since 1974. *See* Ad.Rec.Doc. 11 (referring to OCS sale 33, March 28, 1974). The effect of this consistent use of the number of bids as a relevant factor over a period of some six years in 28 lease sales is to overrule the Board's prior decisions, all of which related to a different system of bid evaluation.[4] Moreover, it is irrelevant that in November, 1980, after plaintiffs' bids had been rejected, the Secretary changed departmental policy regarding the treatment of tracts where few bids are received and the high bid, while falling below MROV, exceeds AEOT. *See* Complaint Ex. 3. The Secretary did not intend for this change to have retroactive effect and it is within his discre-

tion to have his decisions operate prospectively. *See Safarik v. Udall, supra,* 304 F.2d at 249–50.

■■■ Plaintiffs' two bids differed from the high bids on tracts 144 and 167 in that there were more bids on tracts 144 and 167 and those bids exceeded AEOT by a greater margin than did plaintiffs'. Moreover, since there were only two bids on tracts 20 and 228, the Secretary discounted the reliability of the AEOT. Because the Secretary was entitled to use the number of bids in considering the reliability of the AEOT, his decision should not be disturbed.

Plaintiffs attempt to further buttress their comparison of their bids on tracts 20 and 228 with the high bids on tracts 144 and 167 by arguing that the second and third bids on tracts 144 and 167 were anomalously low and therefore the AEOT for those tracts was unreliable. They claim that the second and third bids were anomalously low compared to the MROV. However, the BLM specifically found that no anomalously low bids were submitted, Ad.Rec.Doc. 9 at 2, and the BLM's "⅛ rule" for eliminating anomalously low bids is a rational criteria. BLM eliminates extremely low bids from AEOT calculations because they unduly affect the average. This is done by eliminating any bid which is less than one-eighth of the next lowest bid, a practice based on the experience and expertise of agency economists. Plaintiffs' comparison of low bids to the MROV does not indicate whether a bid is anomalous or out of the ordinary. Indeed, the very fact that there were two low bids on tract 144 and 167 indicates that neither of those bids was "anomalous."

*Conclusion*

Plaintiffs' bids on tracts 20 and 228 were evaluated in accordance with a careful, conscientious system. All of the Secretary's advisors—the GS, the BLM, and the Solicitor's office—recommended rejection. Inevitably some bid rejection decisions involve close calls, but where the Secretary has

---

4. A holding that the Secretary could not consider the number of bids in his decision to accept or reject a high bid would provide an incentive for numerous disappointed bidders to challenge rejection of their high bids in these 28 lease sales.

made his decision in a careful and systematic manner, utilizing the expertise of economists, geologists, and others, his decision cannot be said to be arbitrary and capricious.